IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARCHIBALD LINGO and, | ) |
| ARCHIE'S MARKET, INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civ. No. 10-624-SLR |
| | ) |
| DINAH LINGO, JESSICA LINGO, | ) |
| LINGO BROS., LLC and THE ORIGINAL | ) |
| LINGO'S MARKET, LLC, | ) |
| | ) |
| Defendants. | ) |

_____

Matt Neiderman, Esquire, and Katharine V. Jackson, Esquire, of Duane Morris, LLP, Wilmington, Delaware. Anthony L. Gallia, Esquire, of Duane Morris, LLP, Philadelphia, Pennsylvania. Counsel for Plaintiffs.

Richard A Zappa, Esquire, Adam W. Poff, Esquire, and Monte T. Squire, Esquire, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware. Counsel for Defendants.

_____

**OPINION**

Dated: May 19, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Archibald Lingo ("Archie") and Archie's Market, Inc. (collectively "plaintiffs") filed this action against Dinah Lingo ("Dinah"), Jessica Lingo ("Jessica"), Lingo Bros. LLC, and The Original Lingo's Market (collectively "defendants") on July 2, 2010. (D.I. 1)  In their amended complaint, plaintiffs allege that defendants improperly use their "Lingo's Market" trademark[1] in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114, and Delaware state trademark law, 6 Del. C. § 3312-14 (2009).  Plaintiffs also allege that said use of the mark falsely describes or designates the source of goods or services affecting commerce in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the Delaware Deceptive Trade Practices Act ("DTPA"), 6 Del. C. § 2531 (2009).  (D.I. 47) In addition to the § 43(a) claims, plaintiffs allege that use of their mark by defendants causes dilution in violation of § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).  (Id.) A bench trial was held October18 - October 20, 2010.  The court has jurisdiction pursuant to 28 U.S.C. § § 1331 and 1121.  Having considered the documentary evidence and testimony, the court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. The Parties

---

[1] The court uses the word "trademark" in its opinion in order to be consistent with the parties' use of the term in their briefs.  However, the court recognizes that "Lingo's Market" is most likely a servicemark as it is "[a] mark used in the sale and advertising of [grocery] services to identify the services of one person and distinguish them from the services of another." *Blacks Law Dictionary* 1369 (Deluxe 6th ed. 1990). The court also uses the word "trademark" interchangeably with "mark," as a "trademark" is a subset of source identifying "marks."

1.  Archibald Lingo is a resident of Delaware and is the owner of Archie's Market, Inc.  Archie's Market, Inc. is a Delaware corporation with its principal place of business in Lewes, Delaware.

2.  Dinah Lingo is Archie's sister, and is the owner and operator of The Original Lingo's Market.  Dinah, through her company Lingo Bros., LLC, owns the building where The Original Lingo's Market has operated.  Dinah owns and operates The Original Lingo's Market through her company, The Original Lingo's Market, LLC. Jessica Lingo is Archie's daughter and has been the manager of The Original Lingo's Market.

### B.  The History of Lingo's Market

3.  Lingo's Market has operated at the same address in Rehoboth Beach, Delaware for 112 consecutive years.  (D.I. 60 at 2)  Lingo's Market was run by Archie and Dinah's father, William Lingo ("William"), until his death in 1981.  (*Id.*)  When William became ill, Archie took over the business and ran it continuously until 2009. (D.I. 59 at 3)  William's wife Eleanor Lingo ("Eleanor"), who was the mother of Archie and Dinah, also worked at Lingo's Market after William's death.  (*Id.* at 5)  Eleanor was a regular fixture at the market, who often worked long hours for no pay until she retired in 2005.  (D.I. 60 at 3)

4.  Until Eleanor's death in November of 2009, Archie made rent payments to her pursuant to a lease that he signed for use of the building where Lingo's Market operated.  (*Id.*)  After Eleanor died, the building was put up for a partition sale wherein Dinah purchased the property outright.  (*Id.* at 17)

### C. Ownership of the Mark and the Market

5. There is no clear evidence on record as to who owned Lingo's Market after William's death in 1981. Archie claims that his father gave it to him before he died, and that even Eleanor "thought that [Archie] should take over the business because if [he] did not it would -it would be over. There would be no more Lingo's Market." (D.I. 59 at 3) When William died, neither his will nor his estate planning documents purported to transfer any interest in either Lingo's Market or the "Lingo's Market" trademark to anyone. (JTX 43; JTX 121) However, William's will did contain a residuary clause that created a trust for the benefit of Eleanor out of William's non-personal property. (JTX 121 at 1) Upon Eleanor's death, the trust terminated, and its corpus was distributed to Archie and Dinah per stirpes. (*Id.* at 2)

6. Similarly, Eleanor's will and estate documents made no mention of devising Lingo's Market or the "Lingo's Market" trademark despite the fact that other specific properties were devised. (JTX 43; JTX 122) The only mention of Lingo's Market appears in the paragraph wherein Eleanor disinherits Archie, and provides context as to why she made the decision to do so:

> FOURTH. I make no provisions in this will for my son Archie, except the same amount of love that he showed me after he started living with his French girlfriend, because he has been well provided for. This is because, Archie, you came to me and said "mother, let me show you how to save money by incorporating Lingo's Market." You incorporated it as "Archie Lingo's Market." I trusted you my son, but you used me for [your] own money grubbing ways. I thought your wife Bunny was a piece of work, after living in our house rent free for years with her demands. But your French girlfriend is a real sick person. I work over 100 days a year in the market, 12 hours a day without a break, and my son does not pay me or offer any help. My son makes me wait for the rent check until the end of the year so he can get the interest and only pays half the rent. You only care about your French girlfriend, you treat your mother, your sister and your daughter the same,

without any care.

(JTX 122 at 2)

7.  At one point, Archie indicated that Eleanor was the owner of Lingo's Market. During his divorce proceedings, Eleanor and Archie both testified that Eleanor was the true owner of Lingo's Market, and that Archie was a mere employee.  (D.I. 60 at 11-12; D.I. 66 at 188:19-189:5)  However, during trial, Archie argued that he had convinced his mother to lie about the ownership of Lingo's Market in order to prevent his wife from getting more alimony.  (D.I. 66 at 189:14-21)

8.  Consistent with Eleanor's recitation, Archie incorporated the business in June of 1998, naming himself the sole stockholder and officer under the business name "Archie's Market, Inc."  (JTX 75-76)  Additionally, Archie filed an application for the trademark "Lingo's Market" with the United States Patent and Trademark Office ("USPTO") on May 5, 2008, and was granted registration number 3,553,466 on December 30, 2008.  (JTX 62)

9.  Both parties submitted various documents including vendor invoices and building permits which the parties argue show ownership in either Archie or Eleanor (and, thus, Dinah by means of Eleanor's will).  Archie's documents are far more numerous.  (JTX 95-97 et. al.)  Included in these documents are two leases for the building where Lingo's Market operates, one lease between Eleanor and Archie (JTX 123) and the other between Eleanor and Archie's Market, Inc.  (JTX 124)

## D.  The Contested Mark

10.  The contested trademark consists of a the wordmark "Lingo's Market" whose primary exposure to the public is in the form of two large signs that are affixed to the

wall of the building that Lingo's Market once occupied.  In both their current and previous forms, the signs span the majority of the width of the wall to which they are affixed, and contain the words "Lingo's Market" in large gold lettering.  In their current form, the words "The Original" appear in small font in the upper left hand corner of the sign, integrated into the gold trim.  Similarly, the words "Dinah H. Lingo, Sole Proprietor" appear in the bottom right hand corner of the current signs.  A picture of both signs is found below:


"Lingo's Market" sign as it appeared when operated by Archie


"The Original Lingo's Market" sign as it appears today

### F.  Trademark Infringement

#### 1. Standard

11.  "The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion."  *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994); *Freedom Card, Inc. v. J.P. Morgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005).

12.  A plaintiff proves trademark infringement by demonstrating that:  (1) the mark is valid and legally protectable; (2) plaintiff owns the mark; and (3) the defendant's use of its mark to identify goods or services is likely to create confusion concerning the

origin of the goods or services. *Checkpoint Sys. v. Check Point Software Tech.*, 269

F.3d 270, 279 (3d Cir. 2001); *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237

F.3d 198, 210 (3d Cir. 2000); *Fisons*, 30 F.3d at 472.

13. Likelihood of confusion exists when consumers viewing a mark would

probably assume that the product or service it represents is associated with the source

of a different product or service identified by a similar mark. *Checkpoint*, 269 F.3d at

280; *Victoria's Secret*, 237 F.3d at 211; *Fisons*, F.3d at 472.

14. The Third Circuit has adopted a ten-factor test, known as the "*Lapp* test," to

determine likelihood of confusion in the market. These factors are:

> (1) the degree of similarity between the owner's mark and the alleged
> infringing mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and
> attention expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of
> actual confusion arising;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;
> (7) whether the goods, competing or not competing, are marketed through
> the same channels of trade and advertised through the same media;
> (8) the extent to which the targets of the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of the consumers, whether
> because of the near-identity of the products, the similarity of function, or
> other factors; and
> (10) other facts suggesting that the consuming public might expect the prior
> owner to manufacture a product in the defendant's market, or expect a prior
> owner is likely to expand into the defendant's market.

*Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983); *Sabinsa Corp v.*

*Creative Compounds, LLC*, 609 F.3d 175, 183 (3d. Cir. 2010).

15. No single *Lapp* factor is determinative in a likelihood of confusion analysis,

and each factor must be weighed and balanced against the others. *Kos. Pharms. Inc.*

*v. Andrix Corp.*, 369 F.3d 700,709 (3d. Cir. 2004); *Checkpoint Sys.*, 269 F.3d at 280. The Third Circuit does not discount the strength of one factor because of the weakness of another factor. *Fisons*, 30 F.3d at 476. "Not all of the [*Lapp*] factors are present in every case." *Id.* at 476 n.11. However, if a court finds certain *Lapp* factors to be inapplicable or unhelpful in a particular case, the court should explain its choice not to employ those factors. *Kos Pharms.*, 369 F.3d at 711.

### 2. The mark is valid and legally protectable

16. In the case at bar, there is no dispute that "Lingo's Market" is a valid and protectable trademark. At the very least, one or more of the parties in suit has acquired rights to the mark through its continued use and acquired secondary meaning. *E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 198-99 (3d Cir. 2008). Furthermore, Archie's registration of the mark on the primary register of the USPTO "is prima facie evidence of the mark's validity, the registrant's ownership of the mark, and [his] exclusive right to use the mark in commerce." *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 186 F.3d 311, 315 (3d Cir. 1999) (citing 15 U.S.C. § 1115(a)).

### 3. Ownership of the mark

17. This case turns on who actually owns the mark. If Dinah owns even a partial interest in the common law mark, then her use of said mark is non-infringing, and the case is over despite the fact that Archie has a federal registration. *Marshak v. Tradwell*, 240 F.3d 184, 198 (3d Cir. 2001) (citing *Natural Footware Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1395 (3d Cir. 1985) ("[A] federal registrant is still subject to the defense of a prior user of the mark who has established a market in specific areas notwithstanding that senior user's failure to register.")). However, if Archie is the only

party who owns the mark then, as discussed *infra*, the likelihood of confusion test mandates an injunction against Dinah's use.

18.   The purpose of a trademark is to identify the "source" or "origin" of goods and services, "reducing [consumer] search costs and allowing [consumers] to make decisions that more closely coincide with their preferences."  *Boston Duck Tours, LP v. Super Duck Tours, LLC.*, 531 F.3d 1, 12 (1st Cir. 2008).  Consequently, Archie's use of the mark, and his status as the operator of Lingo's Market for the last 30 years, means that the "source" of the goods and services that customers expect when visiting Lingo's Market is Archie.

19.   The evidence of record, while not compelling, supports the court's conclusion that plaintiffs have carried their burden to prove, by a preponderance of the evidence, that Archie owns the statutory and common law rights to the "Lingo's Market" trademark.  There is no mention of the Lingo's Market trademark in the will or estate documents of either William or Eleanor Lingo.  (JTX 43; JTX 121; JTX 122) Furthermore, Eleanor indicates in her will that Archie had claimed ownership of Lingo's Market when he incorporated the business under "Archie's Market, Inc."  (JTX 75-76, 122 at 2)  Archie's registration of the "Lingo's Market" trademark on the principal register of the USPTO further supports his claim to ownership as it is "prima facie evidence of the mark's validity, the registrant's ownership of the mark, and [his] exclusive right to use the mark in commerce."  *Lucent Info. Mgmt., Inc.*, 186 F.3d at 315 (3d Cir. 1999) (citing 15 U.S.C. § 1115(a)).

20.   Defendants argue that Archie does not own the "Lingo's Market" trademark because he disclaimed ownership during his divorce proceedings.  (D.I. 60 at 11-12)

Archie explained that he actually perjured himself during his divorce proceedings as he did not want his wife to get more alimony. (D.I. 66 at 189:14-21) While the court does not condone Archie's actions, his story is consistent with the record.

21.   Defendants further argue that two leases (JTX 123, 124) show that Archie leased the market itself from Eleanor and not just the building where the market operates. (D.I. 60 at 15) Quite the contrary, these leases illustrate that Archie was the owner of the "Lingo's Market" business and trademark. The first lease, dated June, 9 2005, is the only lease to use the words "Lingo's Market," and then only in the context of identifying the physical location of the property to be leased: "WHEREAS, Lessor owns a certain tract of land in the City of Rehoboth Beach, Sussex County, Delaware, more particularly identified as follows: 30 Baltimore Avenue, Rehoboth Beach, DE 19971, commonly known as 'Lingo's Market.'" (JTX 123 at L0000486) The lease does not specify that Archie is leasing the right to run the business or license the "Lingo's Market" trademark. Moreover, if the court were to find that this lease gave Archie a license to use the mark, said license would be a "naked" license that destroys Eleanor's interest in the mark through abandonment. *Doebler's Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 823 (3d Cir. 2006). This is because the lease provides for absolutely no quality control over the use of the mark, nor provides a way for Eleanor to police its use. *Id.*

22.   The second lease, dated July 1, 2008, is even more persuasive. This lease makes no mention of "Lingo's Market," and lists "Archie's Market, Inc." as the name of the tenant. (JTX 124 at 1) As discussed *supra* (¶ 19), Eleanor felt that Archie had stolen Lingo's Market from her when he incorporated it as "Archie's Market, Inc."

10

Therefore, this lease serves as credible evidence that Archie leased only the right to use the physical building where Lingo's Market operated, not the Lingo's Market business or trademark.

23.  Given his conduct in running the daily operation of the store for the last 30 years, combined with his incorporation of the business and federal registration of the mark, the court finds that Archie owns both the statutory and common law rights to the "Lingo's Market" trademark.

### 4. Likelihood of confusion

#### a. Similarity of the mark

24.  In the case at bar, the marks are essentially identical.  Both parties use the "Lingo's Market" trademark in their advertizing and sales.  When viewed in the context of the signs affixed to the grocery store, the similarities are compelling.  Both signs have the words "Lingo's Market" in large gold letters across a dark background.  Both signs have small gold trim, and span the width of the front of the store.   While Dinah appended "The Original" and "Dinah H. Lingo, Sole Proprietor" to her sign, it functionally does nothing to differentiate her market from Archie's.  These words appear in very



Plaintiffs' Signage



Defendants' Signage

11

small type, and are integrated into the top left and bottom right corners of the sign

respectively. "Lingo's Market" is the clear emphasis of the sign, not "The Original,"[2] or

"Dinah H. Lingo, Sole Proprietor." Because of defendants' use of the complete "Lingo's

Market" trademark, combined with the striking similarities between the signs, this factor

heavily favors plaintiffs.

### b. Strength of the owner's mark

25. "To determine the strength of the mark, courts look to (1) the inherent

features of the mark contributing to its distinctiveness or conceptual strength and (2) the

factual evidence of the mark's commercial strength or of marketplace recognition of the

mark" *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 185 (3d Cir. 2010).

Conceptual strength falls into a spectrum of distinctiveness, classifying marks as either:

(1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary/fanciful. *Id.* Generic marks

describe a class of goods and can never obtain protected status. *In re Pennington

Seed, Inc.*, 466 F.3d 1053, 1058 (Fed. Cir. 2006). Descriptive marks, including marks

that use a person's name, require secondary meaning in order to obtain protection.

*Tana v. Dantanna's*, 611 F.3d 767, 776 (11th Cir. 2010). Marks that are arbitrary,

fanciful or suggestive are considered "inherently distinctive" and may obtain protection

without proof of secondary meaning. *Commerce Nat. Ins. Servs., Inc. v. Commerce

Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000).

26. The Third Circuit has identified eleven non-exhaustive factors relevant to the

_____

[2] Defendants' use of "The Original" actually increases consumer confusion
rather than mollifying it. In the court's eyes, "The Original" means exactly what it says, it
is the original market owned and operated by the Lingo family and, more specifically, by
Archie for the last 30 years.

factual determination whether an item has acquired secondary meaning:

> (1) the extent of sales and advertising leading to buyer association;
> (2) length of use;
> (3) exclusivity of use;
> (4) the fact of copying;
> (5) customer surveys;
> (6) customer testimony;
> (7) the use of the mark in trade journals;
> (8) the size of the company;
> (9) the number of sales;
> (10) the number of customers; and
> (11) actual confusion.

*E.T.Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 199 (3d Cir. 2008).

27.  In the case at bar, the trademark "Lingo's Market" incorporates the name of the proprietor within the mark itself.  Therefore, its conceptual strength is weaker than if it was arbitrary, fanciful, or suggestive, even though there is no dispute that the mark has acquired secondary meaning.  In contrast, there exists substantial evidence of commercialization ranging from magazine articles (JTX 67; JTX 115; JTX 182) to blog posts.  (JTX 52-53)  Therefore, this factor favors plaintiffs.

### c.  Price of goods and other factors indicative of care

28.  The parties own and operate grocery stores under the "Lingo's Market" trademark.  The items in the store are not of such a value or of such a unique nature that customers would pay close attention to the source of the items.  Because the goods that the parties sell are inexpensive and do not require a great deal of research before purchase, this factor favors plaintiffs.

### d.  Length of time defendants have used the mark without evidence of confusion

29.  Defendants have only been using the mark for the last year, yet customers

would still come into the store asking for Archie, and demonstrate confusion as to his association with defendants' business. (D.I. 67 at 405:7-22) Because little to no time has elapsed absent some form of consumer confusion, this factor favors plaintiffs.

### e. Intent of defendants in adopting the mark

30. There is evidence of a bad faith intent in Dinah's adoption of the "Lingo's Market" trademark. For instance, it is uncontested that Jessica took Archie's original sign to a sign company and directed that Archie's sign be duplicated. (D.I. 67 at 392:17-396:8) Therefore, this factor favors plaintiffs.

### f. Evidence of actual confusion

31. There is actual evidence of consumer confusion. Jessica testified that customers would come into the store asking for Archie or saying that they thought it was great that Dinah and Jessica were continuing Archie's business. (D.I. 67 at 405:7-22) Because of this small but quantifiable consumer confusion, this factor favors plaintiffs.

### g. Whether the goods are marketed through the same media

32. The goods are marketed through the same media. Both parties had virtually identical signs on the side of the same building, and both advertized in the same local media. (JTX 50; JTX 106) This factor favors plaintiffs.

### h. Extent to which the targets of the parties' sales efforts are the same

33. It is uncontested that the targets of the parties' sales efforts are the same, namely, residents and visitors to Rehoboth Beach and the surrounding community. Because the parties target the same market, this factor favors plaintiffs.

### i. Relationship of the goods in the minds of the customer

34.  The goods and services offered by both parties are identical, namely, groceries.  This factor favors plaintiffs.

### j. Other factors

35.  Defendants advertise that The Original Lingo's market is in its 112th season, and that it opened in 1889.  (JTX 50 at L0000413)  The necessary implication of this statement is that the business that is owned and operated by defendants is the continuation of the business that is owned and operated by plaintiffs.  Because of this false association, this factor favors plaintiffs.

### 5.  Conclusion

36.  Plaintiffs have proven, by a preponderance of the evidence, that they own a valid and protectable trademark, and that defendants' use of "Lingo's Market" is likely to cause consumer confusion.

## G.  Lanham Act § 43(a)

### 1.  Standard

37.  15 U.S.C. § 1125(a)(1)(a) provides in pertinent part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . .  is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The Third Circuit applies the same test for false designation of origin under § 43(a) as it

15

does to causes of action for trademark infringement.  *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.* 166 F.3d 197, 202 (3d. Cir. 1999);  *Primepoint, L.L.C. v. PrimePlay, Inc.,* 545 F. Supp. 2d 426, 431-32 (D.N.J. 2008).

### 2.  Discussion

38.  Because the court has already found that plaintiffs have a valid and protectable interest in the "Lingo's Market" trademark, and that defendants' use of said trademark is likely to cause confusion under the Third Circuit's *Lapp* test, the court also finds defendants liable for false designation of origin under § 43(a) of the Lanham Act.[3]

## H.  Delaware Common Law and the DTPA

### 1.  Standard

39.  The DTPA prohibits conduct that "[d]isparages the goods, services, or business of another by false or misleading representation of fact" or that generally "creates a likelihood of confusion or of misunderstanding."  6 Del. C. §§ 2532 (a)(8) & (a)(12).  The DTPA has a lower burden of proof than the Lanham Act since "a complainant need not prove competition between the parties or actual confusion or misunderstanding" to prevail in an action under the DTPA, 6 Del. C. § 2532(b).

### 2.  Discussion

40.  The court has already found that plaintiffs have a valid and protectable interest in the "Lingo's Market" trademark and that defendants' use of said trademark is likely to cause confusion under the Third Circuit's *Lapp* test.  The court, therefore,

---

[3]  Defendants make no arguments specific to § 43(a) of the Lanham Act.

concludes that defendants are also liable for violating the DTPA.[4]

## I. Dilution

### 1. Standard

41.  In order to establish a federal dilution claim, a plaintiff must show:

(1)  the plaintiff is the owner of a mark that qualifies as a 'famous' mark in light of the totality of the four factors listed in § 1125(c)(a);
(2)  the defendant is making commercial use in interstate commerce of a mark or trade name,
(3)  defendant's use began after the plaintiff's mark became famous; and
(4)  defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services.

*Times Mirror Magazines, Inc. v. Las Vegas Sports News*, 212 F.3d 157, 163 (3d Cir.

2000).

42.  Under 15 U.S.C. § 1125(c)(2)(A), "a mark is famous if it is widely recognized

by the general consuming public of the United States as a designation of source of the

goods or services of the marks owner."  Relevant factors include:

(i) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties;
(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark;
(iii) The extent of actual recognition of the mark;
(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register;

15 U.S.C. § 1125(c)(A)(i)-(iv).

43.  Liability for dilution occurs if, "at any time after the owner's mark has become

famous, [defendant] commences use of a mark or trade name in commerce that is

likely to cause dilution by blurring . . . regardless of the presence or absence of actual

---

[4]  Defendants make no arguments specific to the Delaware Common Law/DTPA.

or likley confusion, of competition, or of any actual economic injury." 15 U.S.C. §

1125(c)(1).  Blurring "is association arising from the similarity between the mark or trade

name and a famous mark that impairs the distinctiveness of the famous mark.  15

U.S.C. § 1125(c)(2)(B).  Relevant factors include:

> (i) the degree of similarity between the mark or trade name and the famous
> mark;
> (ii) the degree of inherent or acquired distinctiveness of the famous mark;
> (iii) the extent to which the owner of the famous mark is engaging in
> substantially exclusive use of the mark;
> (iv) the degree of recognition of the famous mark;
> (v) whether the user of the mark or trade name intended to create an
> association with the famous mark; and
> (vi) any actual association between the mark or trade name and the famous mark.

  15 U.S.C. § 1125(c)(2)(B)(i)-(vi).

## 2.  Discussion

44. Plaintiffs have failed to show that the "Lingo's Market" trademark is famous

within the meaning of 15 U.S.C. § 1125(c).  Of particular import is that "Lingo's Market"

falls short of **national** fame as contemplated by the Trademark Dilution Revision Act

("TDRA").  *I.P. Lund Trading Aps v. Kohler Co.*, 163 F.3d 27, 47 (1st Cir. 1998)

("[N]ational renown is an important factor in determining whether a mark qualifies as

famous under the [TDRA].");  *Oriental Financial Group  Inc. v. Cooperative De Ahorro y*

*Creditor Oriental*, 750 F. Supp. 2d 396, 404 (D.P.R. 2010).  While not strictly necessary,

plaintiffs provided no evidence of consumer surveys, or advertisements outside of the

Rehoboth Beach community.  There is simply no evidence of record that "Lingo's

Market" has acquired national fame.  *Compare University of Kansas v. Sinks*, 644 F.

Supp. 2d 1287, 1307 (D. Kan. 2008) (Plaintiff's use of mark at KU events for years

along with evidence of advertising, unsolicited media references, and substantial sales

of licensed merchandise displaying the marks supported a jury's finding of national fame.).

45.  Because "Lingo's Market" does not have the national fame required for protection under 15 U.S.C. § 1125(c), plaintiffs' request for injunctive relief for trademark dilution is denied.

**J. Permanent Injunction**

46.  In determining whether to grant a request for a permanent injunction, the court must consider whether:

> (1) the moving party has shown actual success on the merits;
> (2) the moving party will be irreparably injured by the denial of injunctive relief;
> (3) the granting of the permanent injunction will result in even greater harm to the defendant; and
> (4) the injunction would be in the public interest.

*Gucci Am., Inc. v. Daffy's, Inc.*, 354 F.3d 228, 236-37 (3d Cir. 2003)*; Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001).

### 1.  Success on the merits and irreparable harm to plaintiff

47.  Here, the court has determined that defendants' use of "Lingo's Market" constitutes trademark infringement.  Accordingly, the court concludes that plaintiffs have shown actual success on the merits.  Plaintiffs have demonstrated that defendants will continue to use the mark absent an injunction, thus establishing a probability of irreparable harm.  *Pan Am. World Airways, Inc. v. Flight 001, Inc.*,  Civ. No. 14442, 2007 WL 2040588, at *7 (S.D.N.Y. Jul. 13, 2007).

### 2.  Harm to defendant

48.  At trial, defendants presented no evidence of the harm they will suffer if the

court grants a permanent injunction.

### 3. Public interest

49.  The public interest concern in trademark infringement cases is "the interest in the prevention of confusion, particularly as it affects the public interest in truth and accuracy." *Kos Pharms.*, 369 F.3d at 730.  "Having already established that there is a likelihood of consumer confusion created by the concurrent use of the . . . marks, it follows that if such use continues, the public interest would be damaged.  Conversely, a prohibition upon [defendants'] use of the marks would eliminate that confusion." *Optician's Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 198 (3d Cir. 1990).  Accordingly, the court concludes that the public interest would be served by a permanent injunction.

### K.  Jessica's Liability

50.  Defendants argue that Jessica is incapable of liability for trademark infringement because she has no ownership interest in Dinah's grocery store.  (D.I. 60 at 21-22)  Plaintiffs argue that she is liable because she is a "moving, active [and] conscious force" behind the infringement.  (D.I. 65 at 23-24)  For example, she ordered and helped design the infringing sign, and she represented to newspaper reporters that defendants' business operations were a continuation of plaintiffs'.  (*Id.*)

51.  Given the convoluted history of the ownership of the "Lingo's Market" trademark, the court declines to find Jessica liable, as she was a mere employee during the period of the activities in question.  *Johnson & Johnson Consumer Co., Inc. v. Aini*, 540 F. Supp. 2d 374, 393 (E.D.N.Y. 2008).

## III.  CONCLUSION

52. For the reasons discussed above, the court concludes that plaintiffs own both the statutory and common law rights to the "Lingo's Market" trademark, and that defendants' use of said mark causes a likelihood of confusion under the Third Circuit's *Lapp* test. The balance of harm favors a permanent injunction and, therefore, defendants are enjoined from using the "Lingo's Market" trademark itself. If defendants wish to use the word "Lingo's" in connection with grocery services, they must also include Dinah's first name in the same font, color and size as the word "Lingo's," and cannot include the word "Market." Costs and attorney fees are awarded to plaintiffs. Jessica is not liable for trademark infringement, and shares no part of the cost and fee award.